## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DAVID SPILLER,** | : | **CIVIL ACTION** |
| *Plaintiff,* | : | |
| | : | |
| **v.** | : | **No. 18-4188** |
| | : | |
| **UNITED STATES OF AMERICA,** | : | |
| *Defendant.* | : | |

## <u>MEMORANDUM</u>

## I.   Introduction

This action arises from a motor vehicle collision involving Plaintiff, David Spiller, and the driver of a United States Postal Service vehicle, Anthony Imeokparia, at the corner of Eden and Lansford Streets in Philadelphia, Pennsylvania.  Plaintiff and the postal carrier both claim that the other failed to stop at his respective stop sign.

Plaintiff filed the instant case against the postal carrier and the United States of America (the "Government") pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, *et. seq.* claiming damages for orthopedic, cognitive, and neurological injuries allegedly sustained in the collision.  The Government disputes these assertions and submits that Plaintiff has recovered from whatever minor injuries he may have suffered in the collision.

The parties stipulated to the dismissal of claims against the postal carrier, Anthony Imeokparia, individually, as he was "in the course and scope of his

employment with the United States of America at the time of the subject accident."
ECF No. 7.

In December 2019, this Court conducted a four-day bench trial, during
which it heard testimony from Plaintiff and Defendant and reviewed the parties'
documentary evidence.  Having conducted the bench trial, reviewed the parties'
proposed findings of fact and conclusions of law, and examined the relevant law,
this Court finds as follows:

## II.    Findings of Fact

1.      It was stipulated between the parties that a motor vehicle collision
occurred involving David Spiller ("Plaintiff") and Anthony Imeokparia (the "postal
carrier").  ECF No. 32 at 3-4.

2.      It was stipulated between the parties that the collision occurred on
January 23, 2017.  *Id*.

3.      It was stipulated between the parties that the collision occurred at the
intersection of Lansford Street and Eden Street in Philadelphia, Pennsylvania (the
"intersection").  *Id*.

4.      It was stipulated between the parties that the postal carrier was
employed by United States Postal Service ("USPS") at the time of the collision.
ECF No. 7.

5.      It was stipulated between the parties that the postal carrier was in the course and scope of his employment with USPS at the time of the collision.  ECF No. 7

6.      It was stipulated between the parties that the postal carrier was operating a truck (the "postal truck") owned and maintained by USPS at the time of the collision.

7.      It was stipulated between the parties that Plaintiff was covered by a limited tort policy of automobile insurance at the time of the collision.  ECF No. 25.

**The Collision**

8.      Plaintiff credibly testified that he was travelling on Lansford Street prior to the collision.  Trial Tr., Day 1 at 199.  When he approached the stop sign for his line of travel, there were no vehicles in front of Plaintiff's vehicle.  Trial Tr., Day 1 at 201.

9.      Upon arrival at the stop sign, Plaintiff came to a complete stop and looked both right and left for other vehicles.  Trial Tr., Day 1 at 201.  When he looked left, Plaintiff noticed the postal truck proceeding down Eden Street toward the intersection, which had not yet reached its respective stop sign.  Trial Tr., Day 1 at 201-202.  Indeed, Plaintiff testified that the postal truck was about 25 yards from the intersection.  Trial Tr., Day 1 at 202.

10.     Plaintiff, believing that he had the right of way, then proceeded into the intersection.  Trial Tr., Day 1 at 202 ("As I looked to the left, I noticed the postal truck proceeding down Eden.  I looked back to the right, no cars coming.  Looked back to the left, the Postal Service hadn't reached the stop sign yet.  I felt it was my turn to go, and I proceeded through the stop sign.").

11.     Plaintiff testified that when he was about three quarters of the way through the intersection, the front of the postal carrier struck the driver's side rear quarter panel of Plaintiff's vehicle, causing Plaintiff's vehicle to spin.  Trial Tr., Day 1 at 202-203 ("I proceeded into the intersection, and I heard a thump.  And before I knew it, I was spinning around, and I wound up facing the opposite way.  And I didn't know what happened.").

12.     Plaintiff credibly testified that at the time he entered the intersection, he was not having any difficulty operating his vehicle in any way.  Trial Tr., Day 1 at 202.  He further testified that he was not feeling in any way that would inhibit his ability to operate a motor vehicle.  Trial Tr., Day 1 at 202-203.

13.     The postal carrier, Anthony Imeokparia, testified that when he reached the intersection of Eden and Lansford Streets, he stopped at the four-way stop sign and then proceeded into the intersection.  Trial Tr., Day 1 at 56 & 81-82.

14.     Imeokparia testified that when he was halfway through the intersection, driving at an approximate speed of five miles per hour, Plaintiff entered the intersection without stopping.  Trial Tr., Day 1 at 56 & 81-82.

15.     Imeokparia testified that in an effort to avoid colliding with Plaintiff's vehicle, he turned left onto Lansford Street.  Trial Tr., Day 1 at 56 & 81-82. However, Plaintiff "slowed down and turned right into [his] line of escape" and thus, the postal truck's "bumper pushed [Plaintiff] and had the impact." *Id*.

16.     Imeokparia testified that at the time of the collision, he had been on duty for twelve hours.  Trial Tr., Day 1 at 70-71.

17.     Imeokparia testified that he had completed delivering the mail and was driving back to the Torresdale Station when the collision occurred.  Trial Tr., Day 1 at 75.  However, Plaintiff's son, David Spiller, Jr., testified that while at the scene of the collision, he observed the postal carrier "[g]oing from house to house, delivering mail."  Trial Tr., Day 1 at 28-29 ("Q:  So just so we can be clear, is it your testimony that while the vehicles are still in the roadway, he's going house to house, still handing out mail?  A:  Yeah, that's correct.").

18.     Plaintiff's son testified that upon learning from his mother that Plaintiff had been in an accident, he "immediately went over to the scene and wanted to check on my dad."  Trial Tr., Day 1 at 23.

19.     While at the scene of the collision, Plaintiff's son took photographs of Plaintiff's vehicle, which show damage to the driver's side rear quarter panel of Plaintiff's vehicle.  Trial Tr., Day 1 at 26-27; *see also*, Ex. P1 at A-D.

20.     While at the scene of the collision, Plaintiff's son also took photographs of the postal truck.  Trial Tr., Day 1 at 28.  Those photographs show damage to the very front of the postal truck.  Ex. P2 at A-E.

21.     The photographs of the respective vehicles are consistent with Plaintiff's testimony regarding the collision and inconsistent with the postal carrier's testimony regarding the nature of the collision.

22.     The postal carrier's supervisor, Sheryl Frazier, testified that she took photographs during her investigation at the scene of the collision shortly after the collision occurred, including photographs of the scene of the collision, Plaintiff's vehicle, the license plate of Plaintiff's vehicle, the postal truck, and the license plate of the postal truck.  Trial Tr., Day 1 at 184-185.

23.     Frazier testified that she uploaded those photographs and sent them to the acting USPS Safety Manager on multiple occasions, in accordance with established USPS policy and practice.  Trial Tr., Day 1 at 185-186.

24.     The photographs taken by Frazier during her investigation of the collision were not produced to Plaintiff and were "lost" by the time she was deposed on March 22, 2019.  Trial Tr., Day 1 at 186-189.

**The Alleged Injuries**

25.     Plaintiff alleges the following injuries as a result of the accident: headaches, neck and back injuries, and a concussion resulting in emotional and cognitive deficits.  Compl., ECF No. 1.

**Preexisting Conditions**

26.     Plaintiff injured his shoulder in 2008 and has not worked since.  Trial Tr., Day 1 at 194.

27.     At the time of the 2017 collision, Plaintiff had been consuming prescribed Oxycontin and Oxycodone for a number of years relating to his chronic shoulder injury, as well as Xanax for anxiety.  Dep. Tr., Dr. Valentino, at 60-63. Plaintiff admitted to taking Oxycontin and Oxycodone on the day of the collision. Trial Tr., Day 1 at 221-223.

28.     Before the collision, Plaintiff suffered from the following:  diabetes; chronic shoulder and neck pain; high blood pressure; high cholesterol; coronary heart disease; and chronic, stroke-like ischemia.  Trial Tr., Day 1 at 218-220, 56 & 80; Trial Tr., Day 3 at 36-37.

29.     Plaintiff also suffered from depression, anxiety, and panic attacks; had trouble sleeping; and experienced difficulties with everyday activities prior to the collision.  Trial Tr., Day 1 at 219-220; Ex. P27 at 23-24 & 34-36.

**Treatment**

30.     Plaintiff was taken from the scene of the collision via ambulance to the emergency room at Aria Hospital.  Ex. P12.

31.     It was documented at Aria Hospital that Plaintiff complained of "lower back pain and neck pain after the collision" and that he "state[d] he was slightly confused after the collision."  Ex. P12 at 1.

32.     Upon completion of a physical exam, medical records noted that in regard to a neck exam, Plaintiff had "mild midline cervical spine tenderness" and in regard to a back exam, Plaintiff had "lumbar midline spinal tenderness."  Ex. P12 at 4-5.

33.     It was additionally noted that "Pt work up negative for trauma.  He does admit to mild continued headache."  Ex. P12 at 6.

34.     The emergency room report is absent of any report of nausea and/or vomiting.  Ex. P12.

35.     During the emergency room visit, Plaintiff underwent a computerized tomography ("CT") scan of his brain, which showed "no acute intracranial injury."  Ex. P12 at 7.

36.     Plaintiff was ultimately diagnosed in the emergency room with a "[c]losed head injury" and a "[L]umbar strain – [L]ow back strain" and discharged from the emergency room.  Ex. P12 at 15.

37.     The Discharge Instructions provided to Plaintiff in Aria Hospital instruct on how to care for a concussion and a low back injury.  Ex. P12.

38.     Plaintiff thereafter came under the care of the following medical professionals:  Dr. Randall Smith (orthopedic surgeon), Dr. Scott Pello (neurologist and pain management), Dr. Jack Jallo (neurosurgeon), and Dr. Gabriel Tatarian (neurologist).  Exs. P13-P15 & P20.

**Alleged Neck and Back Injuries**

39.     After the collision, Plaintiff continued to complain about pain in his neck, restricted range of motion in the neck, pain in the low back, and restricted range of motion in the low back.  Exs. P13-P15 & P20.

40.     Plaintiff completed a course of physical therapy under the guidance of orthopedic surgeon Dr. Smith.  Ex. P13.  Plaintiff testified that the physical therapy did little to relieve his symptoms.  Trial Tr., Day 1 at 209.

41.     Plaintiff was thereafter referred for a magnetic resonance imaging ("MRI) scan of his cervical spine (neck) and lumbar spine (low back).  Exs. P18 & P19.

42.     The MRI of Plaintiff's neck was performed on May 24, 2017.  Ex. P18.

43.     The MRI of Plaintiff's neck was initially read and interpreted by radiologist Dr. Joel Swartz, who noted the following:  disc herniation at C5-6; disc

herniation at C6-7; and disc protrusion at C4-5. Ex. P18. Dr. Swartz also noted that the herniated disc at C6-7 was reducing the canal diameter and displacing the cervical spinal cord. Ex. P18.

44.　　The MRI on Plaintiff's low back was performed on June 22, 2017. Ex. P19.

45.　　The MRI of Plaintiff's low back was also initially read and interpreted by Dr. Swartz, who noted the following: disc protrusion at L2-3; disc protrusion at L3-4; disc protrusion at L4-5; and disc protrusion at L5-S1. Ex. P19. Dr. Swartz also noted neural foraminal narrowing at L3-4 and L5-S1 and high-grade segmental stenosis at L4-5. Ex. 19.

46.　　Based on both sets of MRI findings, Plaintiff was referred for a surgical consultation with neurosurgeon Dr. Jallo, which took place on October 3, 2017. Ex. P20.

47.　　Dr. Jallo noted the following during that visit: bilateral neck pain (left greater than right); pain radiating into the left arm; numbness and tingling in the left arm; weakness of the left arm; unsteady gait; and bilateral leg weakness. Ex. P20.

48.　　Dr. Jallo recommended that Plaintiff undergo surgery to repair the damage to his neck, specifically an anterior cervical discectomy and fusion of C5-7. Ex. P20.

49.     Dr. Jallo identified the collision as the onset of Plaintiff's orthopedic injuries.  Ex. P20.

50.     Plaintiff was unable to undergo the surgery recommended by Dr. Jallo out of concern for his underlying cardiac condition.  Dep. Tr., Dr. Valentino, at 40 ("Well, because he had complicated medical issues.  He was insulin-dependent diabetic.  He had hypertension.  He had heart issues, so, you know he wasn't in the best of health to tolerate a procedure, you know, at that point in time."); Trial Tr., Day 3 at 56 & 68; Dep. Tr., Dr. Dooneief, at 76.

51.     Dr. Valentino testified, however, that Plaintiff could be eligible for surgery in the future if his health improved.  Dep. Tr., Dr. Valentino, at 40-41.

*Plaintiff's Expert Witnesses*

52.     The following experts testified at trial on behalf of Plaintiff regarding his alleged orthopedic injuries:  Dr. Steven Valentino and Dr. Scott Pello.  Exs. P21 & P22.

53.     Dr. Valentino testified that the cervical MRI showed that Plaintiff "had some desiccation.  So that means he had some wear and tear changes, and that he also had a protruding disc between C-4/5 however at C-5/6 and C-6/7, there were discs that were herniated and they were herniated towards the left, and they were displacing his spinal cord and creating pressure on the nerves going down to his arm."  Dep. Tr., Dr. Valentino, at 34.

54. Dr. Valentino testified that the lumbar MRI showed

> some disc degeneration, some normal wear and tear changes. That much you would expect, but also showed that he had disc protrusions at L3/4 and L5-S1, but more importantly at L-4/5. So not at that last level of the spine, but the level above that, he had high grade stenosis.  So basically, you know, if this is the nerve coming out in his spine, it should go through a nice open space, and he had extreme tightness from a combination of disc problems, arthritis, called ligamental flavum hypertrophy, but that was significant.  It wasn't a little bit.  It was a pretty significant degree of stenosis.

Dep. Tr., Dr. Valentino, at 35-36.

55. Based on his examination of Plaintiff and his review of the records, including diagnostic tests, Dr. Valentino opined that as result of the collision, Plaintiff

> suffered the cervical disc herniations, and that was causing damage to the nerve going into his arm.  The fancy way of saying that is cervical radiculopathy and it was also causing compression on his spinal cord, and the fancy word for that is myelopathy, and the he had also aggravated that stenosis in the lumbar spine, and that was causing nerve damage in the leg, those nerves exiting the back going down the legs, and a fancy way of saying that is lumbar radiculopathy.  So basically cervical disc herniation, cervical radiculopathy and the myelopathy, spinal cord compression, aggravation of stenosis, lumbar radiculopathy.

Dep. Tr., Dr. Valentino, at 41-42.

56. Dr. Valentino further testified that he believed that those injuries were permanent.  Dep. Tr., Dr. Valentino, at 44.

57.     Dr. Pello testified that "given the severity of the injury and the duration of the injury, [Plaintiff] will be expected to suffer from permanent injury to the neck and low back, with decreased range of motion and pain throughout his life." Dep. Tr., Dr. Pello, at 55-56.

58.     Dr. Pello further opined that the treatment and diagnostic testing Plaintiff had undergone since the accident was "reasonable, necessary and causally related to the [collision]." Dep. Tr., Dr. Pello, at 57.

*Government's Expert Witnesses*

59.     The Government presented the testimony of Dr. Richard Mandel, an orthopedic surgeon, who testified that when he examined Plaintiff on June 3, 2019, Plaintiff's principal complaint was lower back pain. Trial Tr., Day 3 at 16.

60.     Dr. Mandel testified that when he asked Plaintiff about pain in areas other than his back and "frequent headaches," Plaintiff told Dr. Mandel "that he was not experiencing any other symptoms related to this accident. He did have a history of shoulder pain and neck pain, but he told me that these things were unaffected by the accident." Trial Tr., Day 3 at 17.

61.     Based upon his review of the medical records and his independent medical examination of Plaintiff, Dr. Mandel opined that Plaintiff suffered lumbar back strain and sprain as a result of the subject collision. Trial Tr., Day 3 at 18-19. In other words, Dr. Mandel described that injury as a "soft tissue" injury and

testified that "generally these injuries heal within a period of months, three to six months on average." Trial Tr., Day 3 at 18-19.

62.     Based upon his review of the medical records and his independent medical examination of Plaintiff, Dr. Mandel further opined that he "did not find evidence of an ongoing injury related to this January 2017 accident." Trial Tr., Day 3 at 19-20.

63.     Dr. Mandel further opined that as of the June 3, 2019 examination, there was no evidence of ongoing sprain and strain as a result of the accident. Trial Tr., Day 3 at 19.

64.     Additionally, Dr. Mandel opined that the January 23, 2017 CT scan showed that "there were multiple degenerative changes within the neck at multiple levels in the cervical spine and also what we call as part of that disc osteophyte complexes, which means bone spurs that form on the edges of the vertebrae at multiple levels. These are not herniated discs. These are part of the degenerative process." Trial Tr., Day 3 at 21.

65.     Significantly, Dr. Mandel admitted that he did not review the May 24, 2017 MRI films of the cervical spine; rather, Dr. Mandel merely reviewed the radiology report. Trial Tr., Day 3 at 63-65. One wonders how Dr. Mandel can offer such an opinion without having reviewed the MRI in contrast to the emergency room CT scan.

**Alleged Head Injury and Cognitive and Emotional Deficits**

66.    Plaintiff and his wife testified that as a result of the collision, Plaintiff

suffered from symptoms caused by his alleged brain injury including headaches,

memory loss, confusion, depression, anxiety, frustration, irritability, fatigue,

change of appetite, and insomnia.  Trial Tr., Day 1 at 192-225; Trial Tr., Day 4 at

3-26.

67.    However, since the collision, Plaintiff has given conflicting accounts

of his alleged symptoms to not only his treating physicians, but also to the experts

called to testify in this case by both Plaintiff and Defendant.

68.    Plaintiff gave the following conflicting and inconsistent accounts of

his alleged headaches he claims to have suffered as a result of the collision to the

experts involved in this case:

      a.   Plaintiff told his neurology expert, Dr. Pello, that his headaches are

         constant and "throbbing."  Dep. Tr., Dr. Pello, at 80.

      b.   Plaintiff told his neuropsychologist expert, Dr. Esposito, that he

         has headaches three times a week.  Dep. Tr., Dr. Esposito, at 3-4,

         7, 21 & 58.

      c.   Plaintiff told Dr. Mandel, the Government's orthopedic surgeon,

         that the headaches are frequent.  Trial Tr., Day 3 at 17.  However,

Plaintiff did not mention to Dr. Mandel any cognitive problems or deficits.  Trial Tr., Day 3 at 25.

    d.  Plaintiff told his psychiatric expert, Dr. Weiss, that the headaches are "pounding."  Dep. Tr., Dr. Weiss, at 50.

    e.  Plaintiff told the Government's neurologist, Dr. Dooneief, that he has headaches as often as four times a day and that they last two to five minutes.  Dep. Tr., Dr. Dooneief, at 7 & 13.

    f.  Plaintiff did not mention headaches to his orthopedic expert, Dr. Valentino.  Dep. Tr., Dr. Valentino, at 53-55.

69.  When Plaintiff saw his pain management physician,[1] Dr. Stuart Kauffman, on February 6, 2017, two weeks after the collision, he did not even mention the accident.  Ex. P27 at 16; Trial Tr., Day 2 at 20-22.

70.  Further, there are medical records during the period of approximately two years after the collision in which there is no mention of headaches.  For example, no headaches were mentioned during Plaintiff's emergency room visit on July 1, 2017, in which it was suspected that Plaintiff may have been having a stroke.  Ex. D39.

71.  During a follow-up appointment for his diabetes, hypertension, and hyperlipemia, it was noted that Plaintiff had "leg numbness and left arm numbness,

---

[1] Dr. Kauffman treated Plaintiff's pain related to the shoulder injuries Plaintiff sustained in the work-related accident occurring on May 29, 2008.  Ex. P27 at 17.

neuropathy in feet, **but no headache, no confusion, no dizziness**, no fainting, no

paresthesias, no saddle paresthesia, no leg weakness, no tingling, no difficulty

walking."  ECF D43 at FISHERDO00001 (emphasis added).

72.     During a similar appointment on September 14, 2018, it was noted

that Plaintiff had "confusion, leg numbness and [] POOR MEMORY," but again

"no headache, no dizziness, no fainting."  Ex. D44 at FISHERDO000029.

73.     During routine appointments with Plaintiff's pain management

physician, Dr. Kauffman, it was routinely noted in Plaintiff's record that Plaintiff

"denies any side effects from the pain medication including sedation, nausea,

vomiting, constipation, mental clouding, and euphoria."  Ex. P27 at 1.  Indeed,

such a notation is made in Plaintiff's record during appointments occurring on

February 6, 2017; March 6, 2017; May 26, 2017; June 26, 2017; July 24, 2017;

August 21, 2017; September 18, 2017; October 17, 2017; November 14, 2017;

December 18, 2017; January 15, 2018; February 12, 2018; March 12, 2018; May 7,

2018; and August 27, 2018.  Ex. P27.

74.     Records from Plaintiff's visits with his orthopedic physician, Dr.

Smith, occurring around the same times as his appointments with Dr. Kauffman,

are strikingly contradictory.  Ex. P13.  Records from Plaintiff's appointment on

February 7, 2017, indicate that Plaintiff

> has stiffness in his neck and continues to have headaches.  He
> does report some mild memory loss such as he was unable to

> remember his drive here with his son and only recalled getting
> to the office.  He also did not remember having spoken to his
> lawyer but his son told him that he did.  Initially when in the
> hospital, he was having nausea and vomiting but this has
> subsided.  He denies any visual changes or any audio changes.
> He has difficulty sleeping.

Ex. P13 at 5-6.  It was recommended that Plaintiff "see a neurologist for evaluation

of his postconcussion syndrome due to his ongoing short-term memory loss."  Ex.

P13 at 7.

75.    Records from Plaintiff's appointment on March 8, 2017, with Dr.

Smith indicate that Plaintiff stated that he "continues to have headaches, which are

more frontal and on the sides, and memory deficit" and that despite Dr. Smith's

referral to a neurologist, "there are some insurances issues, so [Plaintiff] has not

been able to locate one who is able to evaluate him."  Ex. P13 at 9.

76.    Records from Plaintiff's appointment on March 21, 2017, with Dr.

Smith indicate that Plaintiff states he

> has been having ongoing headaches.  Prior to the accident, he
> denies any headaches.   He is still having difficulty
> remembering who I was and that he had seen me in February.
> Eventually, he did recall having seen Dr. Smith and me.  He
> notes that prior to the accident, he did not have any of these
> symptoms, and he is quite concerned about his ongoing,
> persistent symptoms.  He still has intermittent nausea but denies
> any vomiting.  He complains of lightheadedness and dizzy
> spells but denies falls.  He denies any changes in vision.  He has
> delayed speech and mild stuttering, which he notes never
> having had prior to the accident.  He is trying to schedule an
> appointment to see a neurologist but is having difficulty
> locating one that takes his insurance.  He has been taking over

> the counter Motrin as needed for the headaches, which only
> gives him partial relief.  Sometimes he notes that the headaches
> are unbearable and that he has to rest during a period of time.

Ex. P13 at 13-14.  Plaintiff was advised at that appointment to "obtain a

consultation with a neurologist as soon as possible" and to obtain an MRI of the

brain in the meantime for further evaluation.  Ex. P13 at 15.

77.    Records from Plaintiff's appointment on April 5, 2017, with Dr.

Smith indicate that Plaintiff states he "is still having the headaches, which are

gradually improving.  He also still has memory loss, and he is quite concerned."

Ex. P13 at 16.  The records also indicate that Plaintiff obtained an MRI of the brain

and that it was "unremarkable."  Ex. P13 at 16.  Plaintiff was again advised that he

should see a neurologist for a consultation and that it was recommended that

Plaintiff "start to complete puzzles and memory games that help to challenge his

brain activity.  This can help improve his memory skills."  Ex. P13 at 18.

78.    Records from Plaintiff's appointment on May 9, 2017, with Dr. Smith

indicate that Plaintiff stated "he is still having headaches" but that "[h]is memory is

slowly improving."  Ex. P13 at 19.  Plaintiff also indicated that applying ice to his

head had been helping with his headaches."  Ex. P13 at 19.  Plaintiff's treatment

plan indicated that he "will be seeing a neurologist for evaluation of the

postconcussion syndrome."  Ex. P13 at 21.

79.     Records from Plaintiff's appointment on June 5, 2017, with Dr. Smith indicate that Plaintiff complained of continued headaches but that "[h]is memory seems to be improving but is still not back to normal."  Ex. P13 at 22.

80.     Records from Plaintiff's appointment on August 15, 2017, with Dr. Smith indicate that Plaintiff complained of continued short-term memory loss but that it has improved since he started.  Ex. P13 at 30.

81.     Records from Plaintiff's appointment with neurologist Dr. Scott Pello on December 28, 2017, indicate that Plaintiff has "constant and daily" headaches "associated with nausea, minimal photo/phonophobia, occasional blurry vision." Ex. P14 at 1.  According to the records, Plaintiff's "primary complaint today is cognitive issues including:  trouble focusing, concentrating, decreased attention span, insomnia, word-finding difficulty, memory loss, and irritability."  Ex. P14 at 1.  Records from a follow-up appointment with Dr. Pello on July 21, 2017, indicate that Plaintiff again complained of daily headaches and "trouble thinking."  Ex. P14 at 6.

82.     Plaintiff did not follow up with Dr. Pello or meet with another neurologist until September 20, 2018.  Ex. P15.

83.     Records from Plaintiff's appointment with neurologist Dr. Gabriel Tatarian on September 20, 2018, indicate that Plaintiff stated he has "had migraines since [the accident], feels like the top of his his [SIC] is going to blow

off, they pound, had headache most days. + phonophobia, + photophobia, nausea." Ex. P15 at 1.  Dr. Tatarian recommended that Plaintiff receive Botox injections as a preventative measure for his alleged migraines and that he have another MRI of the brain and a "24 hour ambulatory EEG to look for epilepsy as a source of his cognitive difficulty." Ex. P15 at 4.

84.     Plaintiff received his first Botox injections on October 9, 2018, at Dr. Tatarian's office.  Ex. P15 at 6.

85.     At Plaintiff's next appointment with Dr. Tatarian on October 30, 2018, his records indicate that his "[h]eadache is less severe and less often since [B]otox." Ex. P15 at 8.  Those records also indicate that the "MRI and [EEG] are normal." Ex. P15 at 8.

86.     Records from Plaintiff's appointment on January 8, 2019, with Dr. Tatarian indicate that Plaintiff "has had a significant improvement in their daily function as a result of the [B]otox injections," and that he "has noted decrease in intensity of the migraines, possibly less frequent." Ex. P15 at 11.

87.     Plaintiff's records from that appointment also indicate that Plaintiff had not taken any pain medications for the last week or so prior to the appointment, as Dr. Kauffman had him wean off of them over the past three months.  Ex. P15 at 11.  Indeed, his records indicate that Plaintiff "has had increased pain in his joints without the [pain] medication, but no increase in

migraines, and they were actually better to a degree over the past three months.
[Plaintiff] is happy with his progress so far.  He also quit smoking over the past
few weeks."  Ex. P15 at 11.

88.     Records from Plaintiff's appointment on January 15, 2019, with Dr.
Tatarian indicate that Plaintiff "is at least 50% better now, was getting headaches
daily, now 2-3 times per week."  Ex. P15 at 14.

89.     Dr. Dooneief opined that at the time he examined Plaintiff
approximately two and a half years after the collision, "it was very unlikely that
there was any direct relationship between the current headaches and the accident."
Dep. Tr., Dr. Dooneief, at 14.

90.     When asked why Dr. Dooneief reached that opinion, he said "there
were a lot of other factors that might, I think, be contributing to the headaches at
the time that I saw him in July.  Plus, most people who suffer a minor head injury
do not suffer headaches for more than two to six months."  Dep. Tr., Dr. Dooneief,
at 14.

91.     Dr. Dooneief further opined that lack of sleep, caused by chronic pain
and untreated sleep apnea, consumption of painkillers, anxiety, and depression are
the likely causes of Plaintiff's ongoing headaches.  Dep. Tr., Dr. Dooneief, at 15-
22.

92.     Indeed, Dr. Idit Trope, the Government's neuropsychologist, testified that Plaintiff had said his doctor had prescribed for him enough medication "to kill ten people."  Trial Tr., Day 2 at 22.  Plaintiff admitted that he made that statement but recalled saying that it was only "eight people."  Trial Tr., Day 1 at 22.

93.     Dr. Dooneief also opined that Plaintiff requires no further treatment for any neurological injuries he may have sustained as a result of the collision. Dep. Tr., Dr. Dooneief, at 22.

94.     Plaintiff alleges that as a result of the accident, he suffers from a host of emotional and cognitive deficits, which are "consistent with" a concussion. Trial Tr., Day 1 at 9-10.

95.     Plaintiff's accounts of his own alleged deficits are inconsistent:

    a.   Plaintiff told his neurologist, Dr. Pello, that he suffered from memory loss, word-finding difficulty, mood changes, insomnia, and anxiety.  Except for anxiety, Dr. Pello conceded that he did not ask Plaintiff whether he suffered from these deficits before the accident.  Dep. Tr., Dr. Pello, at 63-64.

    b.   Plaintiff mentioned anxiety, irritability, depression, and frustration to Dr. Esposito.  However, Dr. Esposito conceded that she did not review any of Plaintiff's pre-accident medical records.  Dep. Tr., Dr. Esposito, at 19-20 & 63.

    c.  Plaintiff did not mention cognitive deficits to Dr. Mandel.  Trial

       Tr., Day 3 at 25.

    d.  Plaintiff did not mention cognitive deficits to Dr. Dooneief.  Dep.

       Tr., Dr. Dooneief, at 13.

    e.  Plaintiff did not mention cognitive deficits to Dr. Valentino.  Dep.

       Tr., Dr. Valentino, at 55.

96.    Plaintiff presented the testimony of Dr. Joely Esposito, a neuropsychologist, who opined that Plaintiff had cognitive difficulties consistent with post-concussion syndrome but conceded that the difficulties were "mild" and that his cognitive abilities following the accident were "largely intact."  Dep. Tr., Dr. Esposito, at 63-64.

97.    Dr. Esposito conceded that Plaintiff did not tell her about his consumption of Oxycontin and Oxycodone.  Dep. Tr., Dr. Esposito, at 63-64.

98.    Dr. Esposito also conceded that Plaintiff's cognitive difficulties post-accident may be attributable to ischemic, stroke-like changes reflected in the MRI of Plaintiff's brain.  Dep. Tr., Dr. Esposito, at 64.

99.    Dr. Trope, a neuropsychologist and expert in head trauma who testified on behalf of the Government, testified that Plaintiff's chronic ischemia before the collision may explain any cognitive deficits he might have.  Trial Tr., Day 2 at 18.

### III.   Conclusions of Law

1.      Plaintiff asserts a claim against the Government in which he alleges that he was injured by the negligence of the United States.  The case arises under the Federal Tort Claims Act, 28, U.S.C. § 2671 *et seq*. (the "FTCA").

2.      This Court has jurisdiction over the subject matter and the parties to this action pursuant to 28 U.S.C. § 1346(b).

3.      Section 1346 of the FTCA states, in relevant part:

> (b) Subject to the provisions of chapter 171 of this title, the district courts, together with the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

4.      The FTCA is the exclusive waiver of sovereign immunity for claims against the Government for acts or omissions by its employees while acting within the scope of their employment.  28 U.S.C. § 1346(b).

5.      With respect to tort claims as to which the Government has waived its sovereign immunity, the FTCA requires the court to apply the substantive law of the place where the event occurred.  *Alexander v. United States*, 132 F. Supp. 2d

332, 335-336 (E.D. Pa. 2001) (citing *Castro v. United States,* 34 F.3d 106, 110 (2d Cir. 1994); *Daugherty v. United States,* 427 F.Supp. 222, 224 (W.D. Pa. 1977)).

6.      Additionally, under § 2674 of the FTCA, the Government is liable to the same extent as an individual in similar circumstances, except that the Government is not liable for prejudgment interest or punitive damages. *Id*.

7.      Pursuant to § 1346, the law of the place where the negligence occurred governs.  It is undisputed that the collision occurred in Philadelphia County, Pennsylvania.  Thus, Pennsylvania state law controls both as to liability and damages in this case as the collision occurred in Pennsylvania.  *Id*. (citation omitted).

8.      It is well settled under Pennsylvania law that a cause of action for negligence requires a showing of a duty, a breach of that duty, a causal relationship between the breach and the resulting injury and actual loss.  *Id*. (citing *Campo v. St. Luke's Hospital,* 755 A.2d 20, 23-24 (Pa. Super. 2000); *Gardner by Gardner v. Consolidated Rail Corp.,* 573 A.2d 1016, 1020 (Pa. 1990)).

9.      Section 3323 of the Pennsylvania Motor Vehicle Code requires that the driver of a motor vehicle must come to a complete stop at a stop sign and proceed into an intersection only when the way is clear.  75 Pa.C.S. § 3323.

10.      Under Pennsylvania's comparative negligence statute, a plaintiff whose negligence is more than fifty percent the cause of a particular accident may

not recover damages for injuries suffered in that accident from a defendant whose negligence was also a contributing factor. *Boysen v. United States*, 950 F. Supp. 110, 112 (E.D. Pa. 1996) (citing 42 Pa.C.S. § 7102). Stated simply, if the Court concludes that Plaintiff's negligence in causing the accident at issue here exceeded that of the Government, the Court must enter judgment for the Government.

11.     The Court finds by a preponderance of the evidence that the postal carrier had a duty to abide by § 3323 of the Pennsylvania Motor Vehicle Code, that he breached that duty by failing to come to a complete stop at the stop sign, and was one hundred percent (100%) at fault for the significant collision between the postal truck and Plaintiff's vehicle. Plaintiff's credible testimony of the collision was entirely consistent with the points of impact on and the type of damage sustained by both vehicles involved in the collision. Moreover, the Court finds the postal carrier's testimony entirely inconsistent with the evidence presented.

12.     The Court further finds by a preponderance of the evidence that the collision was the proximate cause of Plaintiff's concussion, the herniated discs in Plaintiff's neck at C-5/6 and C-6/7, and the soft tissue injury of Plaintiff's low back.

13.     The Court finds Plaintiff did not establish by a preponderance of the evidence that any alleged ongoing cognitive deficits or ongoing headaches Plaintiff may be suffering are causally related to the January 23, 2017 collision.

14.    The Court further finds by a preponderance of the evidence that Plaintiff suffered a serious impairment of bodily function, which was proximately caused by Defendant's negligence.

15.    Defendant is liable to Plaintiff for $175,000.00 in compensation for the concussion Plaintiff suffered, the herniated discs in Plaintiff's neck, and the low back soft tissue injury sustained by Plaintiff as a result of the accident of January 23, 2017, with postal service carrier Imeokparia's vehicle.  This award fairly and adequately compensates Plaintiff for all damages—economic, noneconomic, as well as past and future medical expenses—including the Court's consideration of the proposed Life Care Plan.[2]

16.    Accordingly, judgment in the amount of $175,000.00 is properly entered in favor of Plaintiff and against Defendant as compensation for the personal injuries that Plaintiff suffered in the January 23, 2017 collision.

17.    An Order will follow.

---

[2] In considering the proposed Life Care Plan and Alex Karras's testimony regarding the same, the Court gave no weight to the plan where the cost projections depended upon medical conclusions.  As to the projected medical costs and care, the Court gave little weight to the plan because Plaintiff did not establish by a preponderance of the evidence that he would pursue the Life Care Plan or any part thereof.  Indeed, Plaintiff has gotten little or no treatment for those injuries found to be caused by the January 23, 2017 collision.

DATED:  **June 1, 2020**                      BY THE COURT:

                                                     **/s/ Chad F. Kenney**

                                                     CHAD F. KENNEY, J.